## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Dorelle L. H., | Civ. No. 20-1057 (NEB/BRT) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Kilolo Kijakazi, Acting Commissioner of Social Security, | |
| Defendant. | |

Thomas A. Krause, Esq., Southern Minnesota Regional Legal Services, counsel for Plaintiff.

Linda Green, Esq., Social Security Administration, counsel for Defendant.

BECKY R. THORSON, United States Magistrate Judge.

Pursuant to 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for disability benefits. This matter is before the Court on the parties' cross–motions for summary judgment. (*See* Doc. Nos. 18, 20.) This matter has been referred to the undersigned magistrate judge for a Report and Recommendation pursuant to 28 U.S.C. § 636. For the reasons discussed below, this Court recommends that Plaintiff's motion for summary judgement be **GRANTED IN PART**, Defendant's motion for summary judgement be **DENIED**, and the matter be remanded for further consideration consistent with this Report and Recommendation.

## BACKGROUND

Plaintiff is a 46-year-old man who applied for disability benefits pursuant to the Social Security Act alleging disability based on bilateral club feet, depression, anxiety, and low IQ. (Tr. 10.)[1] He alleges a disability onset date of November 22, 2016. [2] (Tr. 10.) His claim was initially denied on May 17, 2017, and denied upon reconsideration on July 28, 2017. (*Id.*) He timely requested a hearing, which was held on January 29, 2019. (Tr. 54.) In a decision dated March 13, 2019, the Administrative Law Judge ("ALJ") proceeded through the sequential five-step evaluation process[3] and determined that Plaintiff was not disabled since his alleged disability onset date. (Tr. 10–27.) The Appeals Council denied Plaintiff's request for review on March 9, 2020, making the ALJ's decision the final decision of the Commissioner. 20 C.F.R. § 404.981; (Tr. 1).

---

[1]    Throughout this Report and Recommendation, the abbreviation "Tr." is used to reference the administrative Record. (Doc. No. 17.)

[2]    Plaintiff originally alleged a disability onset date of October 27, 2006. However, he had previously applied for, and been denied, disability insurance benefits and supplemental security income during this period. (Tr. 85.) That decision was not available for review, so Plaintiff, through his attorney, amended the alleged disability onset date to the current application's protective filing date of November 22, 2016. (Tr. 10.)

[3]    At step one, the ALJ must determine whether the claimant is engaging in substantial gainful activity. Step two requires the ALJ to determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe." At step three, the ALJ determines whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listed impairment. Before step four, the ALJ determines the claimant's residual functional capacity ("RFC"). At step four, the ALJ determines whether the claimant has the RFC to perform the requirements of his past work. And at step five, the ALJ determines whether the claimant can do any other work considering his RFC, age, education, and work experience. *See* 20 C.F.R. § 404.1520(a)–(f).

At step one, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since the alleged disability onset date. (Tr. 12.) At step two, the ALJ concluded that Plaintiff had the following medically determinable and severe impairments: degenerative joint disease due to bilateral clubfeet; obesity; neurocognitive disorder; major depressive disorder (MDD); anxiety disorder; PTSD; and alcohol use disorder. (*Id*.) At step three, the ALJ determined that, while severe, none of Plaintiff's impairments, or a combination thereof, met or medically equaled an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App.1. (Tr. 13.) None of these findings are challenged on appeal.

Before continuing to step four, the ALJ determined that Plaintiff had the Residual Functional Capacity ("RFC") to perform "sedentary" work with the following exceptions:

> He could not climb ladders, ropes and scaffolds. He could occasionally climb ramps and stairs. He could occasionally balance, stoop, kneel, crouch, and crawl. He should not work at unprotected heights or have the operational control of moving, dangerous machinery. He could understand, remember, and carry out simple, routine instructions and tasks consistent with SVP level 1 and 2 work. He could have occasional interaction with supervisors and coworkers, but should not be required to perform tandem or group tasks and should not interact with the general public. This is further defined as work indicated as no more than an eight in the SCO people rating. He would be limited to low stress work, defined as work involving only simple, work related decisions; only occasional changes in the work setting; and no production paced work, such as assembly line work or work involving hourly quotas.

(Tr. 17.) At step four, the ALJ concluded that Plaintiff has no past relevant work.

(Tr. 25.) At step five, after considering the Plaintiff's age, education, work experience, RFC, and the opinion of a vocational expert, the ALJ concluded that the Plaintiff had the

ability to perform jobs that exist in significant numbers in the national economy.[4] (*Id.*)
These jobs include document preparer, addressor, and tube operator. (Tr. 26.)
Consequently, the ALJ found Plaintiff not disabled under the Act. (Tr. 27.)

### OPINIONS RELEVANT TO ISSUES RAISED ON APPEAL

On appeal Plaintiff challenges both the physical and mental limitations provided
for in the RFC, asserting that the ALJ failed to properly weigh the medical opinions of
licensed psychologist Bryan Delvin and two examining podiatrists which, if properly
considered, would require finding Plaintiff disabled. (Doc. No. 19, Pl's Mem. in Supp.)

### I.    Opinions relating to Mental Limitations

Plaintiff primarily challenges the mental limitations in the RFC, asserting that the
ALJ failed to properly weigh the opinion of licensed psychologist Bryan Delvin
regarding Plaintiff's cognitive limitations and that error requires reversal. (Doc. No. 19,
Pl.'s Mem. in Supp.) Central to both Mr. Delvin's[5] opinion and the ALJ's analysis of it
are the circumstances surrounding the cognitive testing that Plaintiff underwent over
time. (Tr. 507–09, 10–27, 361, 372, 506.) The testing included two separate full-scale IQ
evaluations using the Wechsler Adult Intelligence Scale-IV ("WAIS-IV") and the Wide
Range Achievement Test ("WRAT"). (Tr. 361, 506.) Another set of testing included an

---

[4]    Notably, the vocational expert opined at the hearing that a person with the above
listed limitations who would also be off-task 20% of the workday would not be
competitive in the national economy without accommodation. (Tr. 76.) The ALJ did not
include the 20% off-task limitation in Plaintiff's RFC.

[5]    Delvin's signature line indicates that he has achieved a master's degree; therefore,
this Court refers to him as Mr. Delvin. (Tr. 506.)

evaluation of Plaintiff's cognitive abilities using various mental status challenges but did not include formal IQ testing. (Tr. 372.)

Mr. Cocker, MS LP,[6] performed the first psychological assessment on October 14, 2016 ("Cocker Testing"). (Tr. 362–63.) Plaintiff achieved a full-scale IQ score of 48,[7] but Mr. Cocker stated that the results would not be considered valid because Plaintiff "was not putting forth significant effort to do well." (*Id.*) Mr. Cocker also assessed Plaintiff's effort using the Rey-15 Item Test, "which is designed to measure the ability and reliability of those claiming impairment due to brain trauma." (*Id.*) A score below 12/15 on this test suggests possible malingering. (*Id.*) Plaintiff scored 9/15, leading Mr. Cocker to state that "no reliable conclusion or diagnosis [could] be drawn from [the] assessment." (*Id.*)

On April 4, 2017, Dr. William Dickson, Ph.D., performed a "Medical Status Exam." (Tr. 373.) Dr. Dickson did not administer a full-scale IQ test; however, he did perform a variety of mental status challenges to assess Plaintiff's cognitive functioning.[8] (Tr. 378–79.) Testing revealed "very limited" immediate attention and concentration for

---

[6]    Like Mr. Delvin, Mr. Cocker is a licensed psychologist with a master's degree; therefore, this Court refers to him as Mr. Cocker. (Tr. 364.)

[7]    A full-scale IQ of 48 is in the lowest 0.1 percentile. (Tr. 363–64.) Although under the current applicable Listing there is not a threshold IQ score below which someone is considered presumptively disabled, as further discussed below, Listing 12.05B applies when there is a full-scale IQ of 70 or below along with significant defects in adaptive functioning.

[8]    The testing consisted of six questions from the WAIS-IV information subscale, a limited number of questions from the WAIS-IV similarity subscale, a forward and reverse digit recall test, and a 25-minute object recall test. (Tr. 378–79.)

short auditory stimuli, and "highly impaired" immediate to remote recall of verbal information. (*Id*.) Upon noting suspicion of malingering in prior testing, Dr. Dickson stated that he "was similarly not convinced that [Plaintiff] gave his best effort" on these mental status challenges. (Tr. 379.) Still, despite concerns about Plaintiff's best efforts, Dr. Dickson estimated Plaintiff's IQ functioning in the borderline range and concluded that he did not believe Plaintiff "would be able to successfully accommodate to work stressors full-time or part-time independently out of the home with any degree of continued success." (Tr. 105, 380.)

Approximately a year and a half later, Plaintiff saw Mr. Delvin, MS LP, on November 12, 2018. Mr. Delvin's Psychological Testing Summary report provided the following Data Sources: (1) Weschler Adult Intelligence Scale (WAIS-IV); (2) Wide Range Achievement Test (WRAT3); (3) Test of Memory Malingering; (4) Interview; and (5) Treatment Record Data ("Delvin Testing"). (Tr. 479.) Mr. Delvin noted: "The client appeared to put forth adequate effort through-out the testing tasks. Current WAIS-IV results are considered a valid estimation of the client's intellectual abilities." (Tr. 480.) Plaintiff achieved a full-scale IQ of 53,[9] with academic achievement scores at the first, second, and third grade level for spelling, reading, and arithmetic respectively. (Tr. 480.)

Plaintiff's efforts were also assessed using the Test of Memory Malingering ("TOMM"), a "standardized assessment used to detect deliberate faking or exaggeration of cognitive dysfunction." (*Id*.) The TOMM involves two trials, a score below 25/50 on

---

[9]    A full-scale IQ of 53 is in the lowest 0.1 percentile. (Tr. 480.)

either trial, or below 45/50 on the second trial "would indicate the possibility of malingering." (*Id*.) Plaintiff's scores of 35/50 on the first trial and 49/50 on the second trial "do not indicate an effort . . . towards deliberate faking or exaggerating of cognitive symptoms." (*Id*.) Based on these findings, Mr. Delvin concluded that the IQ test results would be considered valid and diagnosed Plaintiff with a mild intellectual disability pursuant to Diagnostic and Statistical Manual V ("DSM V") criteria. (Tr. 481.)

In December 2018, Mr. Delvin completed a medical source statement and gave an opinion regarding the cognitive testing he had performed. (Tr. 506–09.) Mr. Delvin opined that Plaintiff's intellectual limitations would result in him being "occasionally unable" or "frequently unable" to perform a variety of work-related tasks. (*Id*.) Of particular relevance here, Mr. Delvin opined that, due to his "intellectual disability," Plaintiff would occasionally be unable to "perform activities within a schedule" and would frequently be unable to "maintain attention and concentration for extended periods of time" or "complete a normal workday and workweek without interruptions from psychological based symptoms." (Tr. 508.)

At the request of Plaintiff's attorney, Mr. Delvin also reviewed the Cocker Testing results from October 2016. Mr. Delvin opined that the Cocker Testing results do not appear to be substantially different from the Delvin Testing results, and "do not appear to cast doubt on the [Delvin Testing]." (Tr. 506.) Furthermore, the "relative consistency" between the two IQ results "suggests reliability and reasonable accuracy." (*Id*.) Mr. Delvin did not specifically address the previous Rey-15 results, noting instead that his own testing included a "screening designed to detect malingering," the results of

7

which "suggest it is unlikely [that Plaintiff] was purposely trying to perform poorly."[10]
(*Id.*)

The November 2018 Delvin Testing results were not available to the State Agency psychological consultants when they reviewed the available medical evidence initially in April 2017 and on reconsideration in July 2017.[11] (Tr. 111, 136.) Both reviews considered only the Cocker Testing, Dickson Assessment, and Dr. Dickson's opinion. State Agency psychological consultants, therefore, did not evaluate the Delvin Testing, including the presumptively valid full-scale IQ, or Mr. Delvin's opinion that Plaintiff's work-related limitations stem from his intellectual disorder. (Tr. 506–09.)

---

[10]   Plaintiff cites two studies suggesting that the Rey-15 Item test is "not an appropriate test for malingering in individuals with intellectual disability." (Doc. No. 19, Pl.'s Mem. in Supp. 32.) A review of the literature seems to support this assertion. A meta-analysis of 13 studies evaluating the Rey-15 using a cutoff score of 9/15 (rather than the 12/15 used by Mr. Cocker) found that the test's specificity, or capacity to identify only malingerers, increased when individuals with intellectual disabilities were excluded. This result indicates that those with intellectual disabilities are disproportionately identified as malingerers even though they put forth full effort, compared to the general population. L. Reznek, *The Rey 15-item memory test for malingering: A meta-analysis*, 19 BRAIN INJ., 539, 540–41 (2005).

Another study found that, using the same cutoff scores as the evaluators in this case, the false positive rate of the Rey-15 was 42.9% compared to the TOMM Trial 2 false positive rate of 4.8% for people with intellectual disabilities. Christopher M. Love et at., *Specificity and False Positive Rates of the Test of Memory Malingering, Rey 15-Item Test, and Rey Word Recognition Test Among Forensic Inpatients with Intellectual Disabilities*, 21 ASSESSMENT, 618, 621–22 (2014).

[11]   State Agency consultants reconsidered the medical evidence after Plaintiff dislocated his toe, which exacerbated his physical limitations. No new evidence of Plaintiff's mental functioning was presented for reconsideration. (Tr. 136.)

As a result, both State Agency consultants did not consider Listing 12.05–

Intellectual Disorders, only stating that a "prior WAIS was invalid" and there "were

questions about validity related to effort." (Tr. 110, 135.) In sum, the medical evidence

was evaluated by the State Agency reviewers without the context provided by a

presumptively valid IQ score.

## II.    Opinions relating to Physical Limitations

Plaintiff also argues that the physical limitations in the RFC do not reflect his true

capabilities because the "ALJ refused to even consider" the opinions of two consulting

podiatrists rendered prior to the alleged disability onset date. (Doc. No. 19, Pl.'s Mem. in

Supp. 37.) He argues that if the ALJ had properly considered the opinions of Dr. Hanson

and Dr. Donnenwerth "the ALJ would have found [Plaintiff] disabled" because he would

not be able to perform even sedentary work. (*Id.*)

In May 2014, Plaintiff was examined by a podiatrist, Dr. Hanson, to assess

treatment options for his clubfeet and obtain a medical source statement in connection

with his prior disability application. (Tr. 330–31.) Dr. Hanson opined that "standing or

walking should be limited to a few minutes" and that "even with surgical correction,

[Plaintiff] would more than likely never be able to stand for long periods . . . or walk for

long distances." (Tr. 331.) He also referred Plaintiff to Dr. Donnenwerth for a surgical

consultation. (*Id.*) In March 2015, Plaintiff consulted Dr. Donnenwerth who opined that

surgery "could help reposition [Plaintiff's] foot to a more neutral position which would

preserve his ankle joint in the long term" and that "continued ambulation with

[Plaintiff's] malalignment" could cause "extremely detrimental" breakdown of his ankle. (*Id.*)

Both opinions were admitted in the record at the administrative hearing on January 29, 2019. (Tr. 57.) However, the ALJ gave them "no weight" because "they do not pertain to the period under adjudication," which began in November 2016. (Tr. 25.)

## DISCUSSION

### I.    Standard of Review

Congress has established the standards by which Social Security disability insurance benefits may be awarded. The Social Security Administration must find a claimant disabled if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . ." 42 U.S.C. § 423(d)(2)(A). The claimant bears the burden of proving that he is entitled to disability insurance benefits under the Social Security Act. *See* 20 C.F.R. § 404.1512(a). Once the claimant has demonstrated that he cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the [RFC] to do other kinds of work, and, second that other work exists in substantial

numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (citations omitted).

The Commissioner's decision will be upheld if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019); *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). Substantial evidence in the record may support two conflicting outcomes, creating a "zone of choice" in which the ALJ may exercise discretion to grant or deny benefits. *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citations omitted). This Court will not overturn an ALJ's determination if it falls within that zone, "even if we might have weighed the evidence differently." *Id.* at 939. (citations omitted). However, "the substantiality of the evidence must take into account whatever fairly detracts from its weight, and the notable distinction between 'substantial evidence' and 'substantial evidence on the record as a whole,' must be observed." *Bauer v. Soc. Sec. Admin.*, 734 F. Supp. 2d 773, 799 (D. Minn. 2010) (citations omitted). This test requires "more than a mere search of the record for evidence supporting the Secretary's findings." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987).

## II.    Analysis

### A.  Mental Limitations

#### 1.  Mr. Delvin's Opinion

Plaintiff asserts that the ALJ improperly gave "little weight" to Mr. Delvin's medical opinion regarding his vocational limitations. (Doc. No. 19, Pl.'s Mem. in Supp.) Plaintiff argues that the "differences between Mr. Delvin's limitations and the ALJ's [RFC] are material" such that the outcome would have been different if Mr. Delvin's opinion had been properly considered and therefore, remand is required. (*Id*.)

 Mr. Delvin, as a licensed psychologist, qualifies as an "acceptable medical source."[12] 20 C.F.R. § 416.902(a)(2). All medical source opinions are weighed according to the following factors: (1) examining relationship; (2) nature and length of the treatment relationship; (3) supportability in light of relevant evidence; (4) consistency with the record as a whole; (5) specialization of the medical source; (6) other factors brought to the ALJ's attention. *See* 20 C.F.R. § 416.927(c)(1–6).

---

[12]    Plaintiff takes the position that the ALJ should have given Mr. Delvin's opinion greater weight as a treating physician (Doc. No. 19, Pl.'s Mem. in Supp. 13), and the ALJ's opinion is ambiguous on this point. In response, the Commissioner argues that the record does not show Mr. Delvin provided patient care to Plaintiff making him a treating psychologist. (Doc. No. 21, Def.'s Mem. in Supp. 6–7.) However, the record does provide some evidence of care or the coordination of care by Mr. Delvin. (*See* Tr. 73 (testifying that Plaintiff worked with Mr. Delvin for "over 17 years"); *see also* Tr. 411 (noting "psychological evaluation by Bryan Delvin on 11/6/03, and diagnostic assessments by Bryan Delvin on 3/9/11 and 6/25/14"); Tr. 412 (noting that Plaintiff "reportedly participated in individual therapy with Bryan Delvin until 2/5/15").) The remand recommended by this Court should include an analysis of Mr. Delvin's treating status.

As stated above, Mr. Delvin opined that Plaintiff would be unable to "perform activities within a schedule" for up to 1/3 of a normal workday, and would be "frequently unable" to "maintain attention and concentration for extended periods of time" or "complete a normal workday and workweek without interruptions from psychological based symptoms." (Tr. 508.) Mr. Delvin supports his opinion by citing to the results of the Delvin Testing. (Tr. 24, 507–09.) Evidence regarding the reliability of that testing is, therefore, highly relevant to the weight given to Mr. Delvin's opinion. 20 C.F.R. § 416.927(c)(3). Here, it is evident from the ALJ's decision that she incorrectly analyzed the medical evidence relevant to Mr. Delvin's opinion. As a result of this error the ALJ did not believe the Delvin Testing was reliable and gave Mr. Delvin's opinion "little weight." (Tr. 24.)

The ALJ found the Delvin Testing unreliable because (1) Mr. Delvin did not address his own inconsistent TOMM results; (2) Mr. Delvin did not consider Dr. Dickson's opinion that Plaintiff did not give full effort in earlier cognitive testing before opining that his own results were valid; and (3) Mr. Delvin did not specifically address earlier Rey-15 results before opining that his own results were valid. (Tr. 24.) Substantial evidence does not support any of the ALJ's reasons for finding the Delvin Testing unreliable. The ALJ's first concern fails because it is based on a mistaken interpretation of the TOMM results that is not supported by the test's scoring instructions. The ALJ's second and third concerns fail because both are based on the inappropriate assumption that assessments of effort in prior testing are relevant to the effort demonstrated in subsequent, unrelated tests.

13

First and most significantly, the ALJ's assertion that the "inconsistent TOMM results" call the validity of the Delvin Testing into question is based on an inaccurate interpretation of the TOMM test and therefore does not constitute substantial evidence. (Tr. 24.) The ALJ's interpretation of the results is not supported by the test's scoring instructions, which state that "scoring lower than chance (50%) on either trial or scoring lower than 45 on Trial 2 would indicate the possibility of malingering." (Tr. 480.) Contrary to the ALJ's findings, different scoring metrics for Tests 1 and 2 indicate that inconsistent scores between the two trials is neither "notable" nor an indication of malingering. (Tr. 16.) Remarkably, the Commissioner's counsel admits—in a footnote— that the ALJ did not correctly interpret the TOMM scores in Mr. Delvin's report, but claims this error is harmless. (Doc. No. 21, Def.'s Mem. in Supp. 10, n.8.)[13] As discussed below, the ALJ's error in interpreting the TOMM test was not harmless – it was pivotal in the ALJ's analysis and ultimate decision.

An error is not harmless if there is "some indication that the ALJ would have decided differently if the error had not occurred." *Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012). Yet, the ALJ relied on her incorrect interpretation of the TOMM scores to cite "inconsistent TOMM findings" as a reason to question the reliability of the Delvin Testing results at multiple points in the decision. (Tr. 16, 21, 22, 24.) In addition, the ALJ

---

[13]    The footnote states: "We do not agree with the ALJ's interpretation of the TOMM scores in Dr. Delvin's report . . . However, even if the ALJ's interpretation was incorrect, any error was harmless because the ALJ's overriding concern was that [Mr.] Cocker and Dr. Dickson thought Plaintiff gave suboptimal effort even if Plaintiff's TOMM scores suggested a legitimate effort for [Mr.] Delvin." (*Id.*)

believed that the suspected malingering in the Cocker testing that was noted in the
Dr. Dickson Mental Exam was grounds for giving the Delvin Testing and his opinion
little weight. Interpreted correctly, the Delvin Testing shows a valid, full-scale, IQ test.
Significantly, Mr. Delvin opined, based on the Delvin Testing results, that Plaintiff would
be "occasionally unable" to "perform activities within a schedule," which the ALJ
equated to being "off-task" up to 33% of the time. (Tr. 508, 82.) A vocational expert
testified that an individual who would be off-task even 20% of the workday would not be
competitive in the national economy without accommodation. (Tr. 76.) The ALJ's error
directly impacted the weight given to Mr. Delvin's opinion, which if accepted, would
have likely led to a finding of disability. Therefore, this Court cannot conclude that the
error was harmless.

The ALJ's second and third reasons for rejecting the Delvin Testing relate to
Mr. Delvin's failure to address suspicions of malingering in prior, unrelated tests before
stating that the Delvin Testing results were valid. Both concerns rest on the assumption
that measures of effort in one test impact the validity of later, unrelated, testing. To the
extent that the ALJ relied on malingering suspicions in earlier tests to question the
validity of later testing, such reliance is an error.

Substantial evidence does not support the ALJ's rejection of the Delvin Testing
results based on assessments of effort in prior tests. It is unclear, and the ALJ does not
explain, how the effort put forth in one round of testing provides any evidence, much less
substantial evidence, about the validity of an entirely separate test, administered by a
different evaluator, at a different time. In an analogous case, an ALJ gave no weight to

15

the results of a later IQ test in part because the examiner was not "aware of earlier IQ testing, which may have resulted in some questions about the validity" of the later testing. *Kane v. Berryhill*, No. 17-cv-1002 (SER), 2018 WL 3543903, at *7 (D. Minn. July 23, 2018). The Court held that substantial evidence did not support this decision because the ALJ failed to "explain why the results of one [test] would be useful in assessing the accuracy of a separate" test, and the "Court [was] unaware of any [precedent] that would necessitate that finding." *Id.* at *7. Similarly, this Court finds that evidence of malingering in prior testing does not constitute substantial evidence which would allow the ALJ to disregard an otherwise valid IQ score.[14]

To conclude, the ALJ's three primary reasons for rejecting the Delvin Testing results are without merit. A critical misunderstanding led the ALJ to believe that the Delvin Testing was unreliable, and that Mr. Delvin's opinion derived from the testing was entitled to "little weight." (Tr. 24.) The ALJ's reasoning was based on an erroneous interpretation of the evidence; therefore, the Court cannot conclude that substantial evidence supports the ALJ's decision to afford "little weight" to Mr. Delvin's opinion. Remand is appropriate to allow the ALJ an opportunity to reevaluate the weight that should be afforded to Mr. Delvin's opinion in light of an accurate interpretation of the "relevant evidence" supporting it. 20 C.F.R. § 416.927 (c)(3).

---

[14]    This is especially true here where two entirely different tests were used to assess malingering, and clinical evidence suggests that the later test is more reliable for people with intellectual disorders. *See* Christopher M. Love et at., *Specificity and False Positive Rates of the Test of Memory Malingering, Rey 15-Item Test, and Rey Word Recognition Test Among Forensic Inpatients with Intellectual Disabilities*, 21 ASSESSMENT, 618 (2014).

## 2. State Agency Psychological Consultants' Opinions

The ALJ gave "great weight" to the opinions of the non-examining State Agency psychological consultants "for their ratings of the Part B criteria and work-related limitations." (Tr. 23.) Specifically, State Agency psychological consultants opined that Plaintiff was "not significantly limited" in his "ability to perform activities within a schedule" and experienced "moderate" limitations in his "ability to maintain attention and concentration for extended periods" and "complete a normal workday and workweek without interruptions from psychological based symptoms." (Tr. 115.) Plaintiff alleges that the ALJ erred by giving great weight to these opinions, especially because "the consultants did not have the opportunity to review Mr. Delvin's November 2018 evaluation that included valid IQ testing" and Mr. Delvin's medical opinion that derived from such testing. (Doc. No. 19, Pl.'s Mem. in Supp. 33.) This Court agrees.

Generally, the opinions of non-examining consultants "deserve little weight in the overall evaluation of disability." *Landess v. Weinberger*, 490 F.2d 1187, 1190 (8th Cir. 1974); 20 C.F.R. § 416.927(c)(1-2). This is especially true "if the consulting physician did not have access to relevant medical records." *McCoy v. Astrue*, 684 F.3d 605, 616 (8th Cir. 2011) (citing *Wildman v. Astrue*, 596 F.3d 959, 967 (8th Cir. 2010)). However, an ALJ may properly give great weight to the opinion of a non-examining source who does not have access to a complete record if the ALJ independently reviews and accounts for evidence that the consultant had not considered. *See Devante D.K. v. Saul*, No. 20-cv-423 (BRT), 2021 WL1140225, at *9 (D. Minn. Mar. 25, 2021); *Kuikka v. Berryhill*, No. 17-cv-374 (HB), 2018 WL 1342482, at *10 (D. Minn. Mar. 15, 2018).

17

Given the facts of this case, substantial evidence did not support giving great weight to the State Agency psychological consultants. Both reviews considered the Cocker Testing, Dickson Assessment, and Dr. Dickson's opinion, but did not consider the Delvin Testing or Mr. Delvin's opinion. (Tr. 111; 136.) While the ALJ did evaluate the Delvin Testing and Mr. Delvin's opinion, that analysis was flawed as discussed in greater detail above. In addition to reconsidering the weight given to Mr. Delvin's opinion, on remand the ALJ should reconsider the weight given to the opinions of non-examining State Agency psychological consultants who did not review the full record.

### 3. Listing 12.05

As stated above, remand is necessary to consider the Delvin Testing and Delvin opinion. Mr. Delvin's opinion, however, is not only relevant to determining proper limitations for Plaintiff's RFC, but it also has bearing on the ALJ's analysis at step three. At step three of the sequential review process the ALJ considered whether Plaintiff met or medically equaled Listing 12.05 – Intellectual Disorders. (Tr. 16.)

Section 12.05 may be satisfied by meeting the requirements of either Section A or Section B. *See* 20 C.F.R. § Pt. 404, Subpt. P, App.1 § 12.05 (2018) (effective March 14, 2018 to April 1, 2021). Section A applies when a claimant does not have the cognitive ability to participate in standardized IQ testing, and is dependent on others for their personal needs. *Id*. Section B applies when a claimant is able to participate in IQ testing; it requires a full-scale IQ of 70 or below along with significant defects in adaptive functioning demonstrated by "extreme limitation of one, or marked limitation of two"

areas of adaptive functioning identified in the regulations.[15] *Id.* Both Sections A and B also require some showing that the deficit manifested before age 22. *Id.* Plaintiff demonstrated the ability to participate in IQ testing, so 12.05A does not apply. However, Plaintiff's full-scale IQ score of 53 is below the 70-point threshold, so Listing 12.05B is potentially applicable here. (Tr. 480); 20 C.F.R. § Pt. 404, Subpt. P, App.1 § 12.00B(1)(a) (2018) (effective March 14, 2018 to April 1, 2021).

The ALJ determined that Plaintiff did not satisfy 12.05B because (1) "two out of the three IQ scores in the file were considered unreliable" and the purportedly valid IQ score was also questionable; (2) the Claimant "did not report, nor is there evidence in the record of deficits in adaptive functioning prior to age 22"; and (3) the Paragraph B limitations were not met because the ALJ determined that Plaintiff experienced "moderate" limitations in all four areas of adaptive functioning. (Tr. 16, 14.) Because of the mistaken analysis of the Delvin Testing, the ALJ's step three determination is called into question.

First, with respect to the IQ scores, the ALJ improperly concluded that the Delvin Testing results were not an accurate reflection of Plaintiff's cognitive functioning and that error was compounded by her inaccurate interpretation of the test results. Regulations, applicable at the time of the ALJ's decision, state that "only qualified

---

[15]    Regulations define the following four areas of adaptive functioning, commonly referred to as "Paragraph B" limitations: (a) "understand, remember, or apply information," (b) "interact with others," (c) "concentrate, persist, or maintain pace," and (d) "adapt or manage oneself." 20 C.F.R. § Pt. 404, Subpt. P, App.1 § 12.05(B)(2)(a–d) (2018) (effective March 14, 2018 to April 1, 2021).

specialists, Federal and State agency medical and psychological consultants, and other contracted medical and psychological experts may conclude that [a person's] obtained IQ scores(s) is not an accurate reflection of [their] general intellectual functioning." 20 C.F.R. § Pt. 404, Subpt. P, App.1 § 12.00H(2)(d) (2018) (effective March 14, 2018 to April 1, 2021). Here, the Delvin Testing administrator, Mr. Delvin, stated that Plaintiff's results were valid based on his own assessment and an objective test designed to detect malingering. (Tr. 480–81.) It was improper for the ALJ to substitute her own lay opinion regarding the validity of the Delvin Testing. 20 C.F.R. § Pt. 404, Subpt. P, App.1 § 12.00H(2)(d) (2018) (effective March 14, 2018 to April 1, 2021); (Tr. 16). Additionally, as discussed above, the ALJ's stated reasons for rejecting the Delvin Testing results are not supported by substantial evidence. This does not mean that the ALJ was required to simply accept the Delvin Testing as valid. Rather, if the ALJ felt she needed an opinion other than Mr. Delvin's regarding the validity of the Delvin Testing, she should have consulted the State Agency psychological consultants, or another expert, who could have given an informed opinion about the validity of the Delvin Testing.

Second, the ALJ asserts that the Claimant "did not report, nor is there evidence in the record of deficits in adaptive functioning prior to age 22." (Tr. 16.) This is incorrect. The Eighth Circuit has held that evidence that a claimant has been placed in special education classes, "had trouble with reading, writing and math," and had an adult IQ score of 70 may constitute substantial evidence that the claimant's "impairment manifested itself during the developmental period" for the purposes of 12.05. *Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006). This inference is appropriate because "a

20

person's IQ is presumed to remain stable over time." *Mucny v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001) (citations omitted).

Here, Plaintiff provided evidence that "supports the conclusion that [his] disorder began before [he] attained age 22." 20 C.F.R. § Pt. 404, Subpt. P, App.1 § 12.00H(4) (2018) (effective March 14, 2018 to April 1, 2021). Plaintiff has consistently reported that he struggled academically and was placed in special education classes before he dropped out of school in the 8th grade. (Tr. 252, 362, 376, 386, 414–15, 424, 443, 481.) Also, like in *Maresh*, Plaintiff has reported struggling to read and has required help filling out forms. (Tr. 379–80, 386, 485.) Additionally, the Delvin Testing results indicate an adult IQ score of 53, well below the score of 70 that was accepted in *Maresh*. 438 F.3d at 899; (Tr. 480).

And third, because the weight given to the State Agency psychological consultants' and Mr. Delvin's opinions was based on a mistaken understanding of the Delvin Testing, this Court cannot say that the ALJ's Paragraph B assessment is supported. The State Agency psychological consultants gave opinions based on the limited record before them, which did not include any valid IQ testing. Notably, neither consultant considered Listing 12.05 and Mr. Delvin opined that Plaintiff's vocational abilities were severely limited by his intellectual disability. (Tr. 110, 135, 508.) Had Mr. Delvin's opinion been given greater weight, after proper consideration of his test results, his opinion may also have been given more weight when considering the Paragraph B criteria. Because of the inherent flaws in the ALJ's decision, and because

remand is necessary to reconsider Mr. Delvin's opinion, the ALJ should also reconsider her analysis under Listing 12.05.

### B. Physical Limitations

Plaintiff also argues that the physical limitations in the RFC do not reflect his true limited capabilities because the "ALJ refused to even consider" the medical opinions of two examining podiatrists who opined that Plaintiff experienced greater physical limitations than reflected in the RFC. (Doc. No. 19, Pl.'s Mem. in Supp.) In May 2014, Dr. Hanson opined that Plaintiff's "standing or walking should be limited to a few minutes" and that "even with surgical correction, [Plaintiff] would more than likely never be able to stand for long periods . . . or walk for long distances." (Tr. 331.) In March 2015, Dr. Donnenwerth opined that "continued ambulation with [Plaintiff's foot] malalignment" could cause "extremely detrimental" breakdown of Plaintiff's ankle. (Tr. 343.) The ALJ gave "no weight" to these opinions because "they do not pertain to the period under adjudication," which began in November 2016. (Tr. 25.)

Applicable regulations require an ALJ to "evaluate every medical opinion received" and "consider all of the [listed] factors in deciding the weight [given to] any medical opinion." 20 C.F.R. § 416.927(c).[16] Furthermore, the Eight Circuit has recognized that medical opinions dated prior to the alleged disability onset date are relevant to a disability determination where there is no evidence of "intervening trauma

---

[16] The listed factors are (1) the examining relationship, (2) the length and nature of the treatment relationship, (3) relevant evidence supporting the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialty of the medical source giving the opinion, and (6) other factors. *See* 20 C.F.R. § 416.927(c)(1–6).

and no indication that [the claimant's] symptoms were deteriorating or were progressive in nature." *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005).

The medical opinions here were admitted in the record during the administrative hearing on January 29, 2019. (Tr. 57.) The ALJ was, therefore, required to assign weight to these opinions only after considering all of the listed factors. 20 C.F.R. § 416.927(c). The ALJ did not rely on any of the specifically listed factors, instead stating that the opinions were given "no weight [because] they do not pertain to the period under adjudication." (Tr. 25.) While the date of the opinion may be a factor to consider, the ALJ's cursory statement indicates that she did not consider any of the other factors as required by the regulations. (Tr. 25); 20 C.F.R. § 416.927(c). Additionally, the ALJ's assertion that the two opinions at issue are irrelevant to the period under adjudication is inconsistent with her citation to "objective medical evidence," which included radiographs taken at those appointments, to assert that Plaintiff's symptoms are "less intense and not as persistent as alleged." (Tr. 19.) Furthermore, in July 2018, Dr. Hanson opined that Plaintiff should engage in "a minimal amount of ambulation" and that "even with surgery . . . [Plaintiff's] feet would [not] be suitable for standing work."[17] (Tr. 435.) The consistency of Dr. Hanson's 2018 and 2014 opinions demonstrate the relevance of his earlier opinion to the current period.

The ALJ's failure to properly consider the podiatrists' opinions was consequential. Plaintiff alleges that he is disabled in part because his physical limitations preclude even

---

[17]    The ALJ did not address Dr. Hanson's 2018 opinion.

sedentary work. (Doc. No. 19, Pl.'s Mem. in Supp.) Dr. Hanson and Dr. Donnenwerth provide the only medical opinions in the record regarding Plaintiff's physical limitations.[18] Dr. Hanson opined in 2014 that Plaintiff could "walk into a work place . . . but standing or walking should be limited to a few minutes" and continued to "recommend a minimal amount of ambulation" in 2018. (Tr. 331, 435.) If these opinions are accepted, Plaintiff would not be able to perform sedentary work, which requires the ability to walk and stand "occasionally," or up to approximately 2 hours per day. 20 C.F.R. § 404.1567(a); SSR 96-09p.

To conclude, Dr. Hanson's and Dr. Donnenwerth's opinions were received by the ALJ and admitted as medical evidence in the record. (Tr. 57.) Rather than addressing any of the factors specifically listed in the regulations, the ALJ gave "no weight" to these opinions because they pre-dated the alleged disability period. 20 C.F.R. § 416.927(c) (1–5); (Tr. 25). Because the ALJ was required to evaluate these opinions using the same framework used to evaluate every other medical opinion, *see* 20 C.F.R. § 416.927(c), remand is necessary for the ALJ to reconsider the weight given to the podiatrists' opinions and reconsider the physical limitations provided in the RFC.

## CONCLUSION

This Court concludes, after a review of the record as a whole, that the ALJ's determination with respect to the weight given to Mr. Delvin's opinion, the State Agency consultants, Dr. Hanson's opinion, and Dr. Donnenwerth's opinion is flawed and requires

---

[18]    Brian Allen D.O. conducted a consultative examination on April 25, 2017, but did not give a medical opinion regarding Plaintiff's limitations. (Tr. 384–86.)

remand for reconsideration. On remand, the ALJ should reconsider steps three through five of the sequential evaluation process consistent with this opinion.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's Motion for Summary Judgment (Doc. No. 18) be **GRANTED IN PART**;

2.      Defendant's Motion for Summary Judgment (Doc. No. 20) be **DENIED**;

3.      This matter be remanded to the Commissioner for further proceedings pursuant to 42 U.S.C. § 405(g) (sentence four), consistent with this Report and Recommendation; and

4.      Judgment be entered accordingly.


Date: July 27, 2021                                    _s/ Becky R. Thorson_
                                                       BECKY R. THORSON
                                                       United States Magistrate Judge


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within fourteen (14) days after being served a copy" of the Report and Recommendation. A party may respond to those objections within fourteen (14) days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).